UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------------X
MARY ANN DI LAPI and SALVADOR DI LAPI, as
Proposed Administrators for the Estate of ANTHONY
DI LAPI, Deceased, and MARY ANN DI LAPI and
SALVADOR DI LAPI, Individually,

           Plaintiffs,                    **ORDER**
                                                              06-CV-3101, 06-CV-2864
     -against-                                     (RJD) (JMA)

THE CITY OF NEW YORK, NEW YORK CITY
POLICE DEPARTMENT, STEPHEN CARACAPPA,
and LOUIS EPPOLITO,

           Defendants.
------------------------------------------------------------------------------X
RACHEL LEAH GREENWALD, as Administrator of the
Estate of ISRAEL GREENWALD, Deceased, and
RACHEL LEAH GREENWALD, MICHAEL
GREENWALD, and YAEL GREENWALD, Individually,

           Plaintiffs,

     -against-

THE CITY OF NEW YORK, NEW YORK CITY
POLICE DEPARTMENT, STEPHEN CARACAPPA,
and LOUIS EPPOLITO,

           Defendants.
------------------------------------------------------------------------------X

**AZRACK, United States Magistrate Judge:**

       On July 19, 2011, plaintiffs were granted leave to file a motion to compel deposition testimony by non-party witness Hugh Mo ("Mo"). Having reviewed the parties' respective motion papers, and for the reasons articulated below, I hereby GRANT plaintiffs' request that Mo be compelled to testify at deposition about his mental processes during his role in defendant

Louis Eppolito's 1985 New York City Police Department ("NYPD") Internal Affairs Division ("IAD") hearing.

## I. BACKGROUND

Plaintiffs are two of several plaintiffs who have filed lawsuits against the City of New York, the NYPD, and former NYPD police officers Stephen Caracappa and Louis Eppolito.[1] These actions, brought pursuant 28 U.S.C. §§ 1983 and 1985, and 18 U.S.C. §§ 1961, 1962, and 1964, and also pleading state law negligence claims, seek redress for crimes committed by defendants Caracappa and Eppolito during their tenure with the NYPD. See generally Compl., Pipitone v. City of New York, et al., No. 06-CV-145 (E.D.N.Y.), ECF No. 1.

Non-party witness Mo is an attorney and former NYPD Deputy Commissioner of Trials who presided over defendant Eppolito's NYPD IAD hearing in April of 1985, ten months prior to the kidnapping and murder of Israel Greenwald. Mot. to Compel Dep. Testimony by Non-Party Witness Hugh Mo ("Pls.' Mot.") 1, Oct. 7, 2011. The City produced Mo for deposition on May 24, 2011, but directed him not to answer certain questions about his role in the 1985 hearing on the grounds that his thought processes are protected by the mental and judicial process privilege. See Dep. Trans. of Hugh H. Mo ("Mo Dep."), Pls.' Mot. Ex. A, 36:25–37:9, May 24, 2011. Mo was, however, allowed to answer questions about the hearing that did not pertain to his mental processes, including factual questions such as what evidence was, or was not, presented to him, and in what form it was presented. Def. City of New York and Non-Party Hugh Mo's Mem. of Law in Opp. to the Greenwald and Di Lapi Pls.' Mot. to Compel Dep. Testimony Re. Mr. Mo's Mental Impressions ("City's Opp.") 1, Oct. 7, 2011. Plaintiffs argue

---

[1] See lead case, Pipitone v. City of New York, et al., No. 06-CV-145 (E.D.N.Y.). Although these actions have been consolidated for purposes of discovery, the instant motion concerns only the Di Lapi and Greenwald plaintiffs.

that Mo's testimony is crucial to their negligence and Monell theories of liability against the City. Pls.' Mot. at 2.

## II. DISCUSSION

The mental process privilege "involves uncommunicated motivations for a polic[y] or decision, [and] has been applied in both the adjudicative and legislative context." N. Pacifica, LLC v. City of Pacifica, 274 F. Supp. 2d 1118, 1122 (N.D. Cal. 2003). "It is well-settled that the decision-making processes of judges are not generally subject to discovery." McGoldrick v. Koch, 110 F.R.D. 153, 155 (S.D.N.Y. 1986) (citing, among other cases, United States v. Morgan, 313 U.S. 409, 422 (1941)). Generally speaking, "[i]n order for judicial testimony to be required, the testimony must relate to the judge's factual knowledge—not his mental processes." United States v. Roth, 332 F. Supp. 2d 565, 568 (S.D.N.Y. 2004).

Preliminarily, plaintiffs appear to suggest that because (1) Mo is not a judge, and presided over the hearing as Deputy Commissioner of Trials in his capacity as an attorney, and (2) he left the NYPD twenty-five years ago, no privilege applies to Mo in the context of the hearing. See Pls.' Mot. at 7. However, as noted by the City, "[w]here, as here, the administrator is acting in the role of a judicial officer, the principles underlying immunity from discovery apply with full force." McGoldrick, 110 F.R.D. at 155. Therefore, for purposes of this motion, the Court assumes that Mo was eligible to invoke the mental process privilege, which protects the mental processes of quasi-judicial officers concerning their roles in administrative hearings.[2] Id.; see also Singer Sewing Mach. Co. v. NLRB, 329 F.2d 200, 206 (4th Cir. 1964) ("The mental process

---

[2] Although the exact basis for the City's assertion of privilege at Mo's May 2011 deposition was unclear, see Pls.' Mot. at 7 n.4, the parties agree in their present motion papers that the privilege at issue is the "mental processes privilege," see id.; City's Opp. at 7. Moreover, plaintiffs do not argue that the City failed to properly invoke the privilege at Mo's deposition.

rule protects the secret mental processes of those who, acting in a judicial or quasi-judicial capacity, make decisions as to facts or as to law.").

Plaintiffs assert three arguments as to why Mo should be compelled to testify about his mental processes during Eppolito's IAD hearing: (1) Mo's mental processes are not privileged because plaintiffs raise a prima facie showing of government misconduct, Pls.' Mot. at 8–9; (2) Mo waived any privilege that applied when he freely and openly discussed his hearing decision with third parties, id. at 9–13; and (3) the City independently waived any privilege that applied when it declined to assert any privilege at the deposition of William Medican, the prosecuting Department Advocate in Eppolito's 1985 hearing,[3] id. at 13. I will analyze each of these arguments in turn.

*(1) Mo's Mental Processes are not Privileged Because Plaintiffs Raise a Prima Facie Showing of Government Misconduct*

As noted by plaintiffs, the mental process privilege is not absolute. See Singer 329 F.2d at 206; see also Nat'l Nutritional Foods Ass'n v. FDA, 491 F.2d 1141, 1145 (2d Cir. 1974). An established exception to the mental process privilege exists for quasi-judicial officers in administrative proceedings where "a party has made a prima facie showing that the decision by an agency or a judicial officer is tainted by impropriety," McGoldrick, 110 F.R.D. at 155, or "upon a strong showing of bad faith or improper behavior," United States v. Ianello, 740 F. Supp. 171, 187 (S.D.N.Y. 1990), rev'd on other grounds sub nom., United States v. Salerno, 937 F.2d 717 (2d Cir. 1991). Where a party has made such a prima facie showing, "the decision-making process may be an appropriate subject of inquiry." McGoldrick, 110 F.R.D. at 156.

---

[3] Medican was previously deposed in these actions and was permitted to testify at length about his opinion and work product during Eppolito's hearing. See City's Opp. at 4 n.1.

4

However, "[m]ere assertions that there was bad faith on the part of the decision-maker will not suffice." Id. at 156 (citations omitted).

Plaintiffs argue that discovery in this case demonstrates that despite overwhelming evidence against Eppolito, "the department thwarted Eppolito's disciplinary hearing by agreeing to stipulations . . . that not only failed to account for the abundant facts in their possession showing Eppolito was guilty, but also contradicted many of the facts they possessed as to Eppolito's guilt." Pls.' Mot. at 9. According to plaintiffs, the factually-flawed stipulations and the fact that the Department Advocate Medican declined to give a closing argument at Eppolito's hearing "suffices for a prima facie showing of impropriety or government misconduct surrounding this hearing." Id.

The City maintains that plaintiffs make no showing that Mo, individually, acted improperly, and that any alleged improprieties on the part of the Department Advocate should not be used to "pierce" Mo's privilege. City's Opp. at 3–4. The City further contends that, "the only evidence reviewed by [Mo] was the evidence that was presented at the trial, and thus he would have no way of knowing what other evidence was developed by IAD." Id. at 4.

I agree that plaintiffs do not present sufficient evidence to support a finding of impropriety or government misconduct on the part of Mo. The strategic decisions made by Department Advocate Medican and IAD over the course of Eppolito's disciplinary hearing may, indeed, be perplexing; however, nothing in the evidence presented by plaintiffs suggests that Mo, as Deputy Commissioner of Trials, engaged in government misconduct. Accordingly, I find that

Mo's right to invoke the mental process privilege has not been waived or nullified on the basis of impropriety or government misconduct.[4]

*(2)   Mo Waived the Mental Process Privilege When He Freely and Openly Discussed his Decision with Third Parties*

Plaintiffs next argue that Mo waived any privilege relating to his mental processes when he previously discussed his role in Eppolito's hearing with third-parties, namely reporters and writers. Pls.' Mot. 9–13.

Mo admits that he previously discussed his role and reasoning in Eppolito's hearing on multiple occasions in published newspaper articles, two published books, and with plaintiffs' attorneys approximately a year prior to his deposition during another case involving similar issues. Mo Dep. at 123:11–21, id. Ex. A. In fact, in the twenty-six years since Eppolito's hearing, Mo has made regular and extensive public comments about his role in the proceeding:

> There was no evidence before me other than that Detective Eppolito epitomizes the finest in the department and is the unfortunate victim of circumstances.

"Detective cleared of leaking secrets," Daily News, Apr. 21, 1985, Pls.' Mot. Ex. P.

> When [Eppolito] walks into my courtroom, I'm saying this guy is something else. This guy looks like a gangster. . . . I can only work within the four corners of these documents. . . I was shocked. I said "What is this, no live testimony?". . . . If [Eppolito] was fully examined subject to direct and cross and the entire-fact-finding process, as well as the supervisor, he might be able to give some insight. . . . In this case, I was not given the opportunity to make additional fact-finding based on demeanor. God knows why the department threw in the towel on this. I never had a chance. . . . The departmental Internal Affairs and departmental advocate gave [Eppolito] a break.

Greg B. Smith, Mob Cops 45–46, id. Ex. M.

> A lot of old detectives are bloodhounds. . . They rely on the smell test to see. The detective says if it smells it must be shitty. But the smell test is not good for

---

[4] The City also argues in its opposition papers that, even if Mo is found to have engaged in government misconduct, McGoldrick would still limit plaintiffs to making factual, rather than mental, inquiries of Mo. City's Opp. at 5. Because I agree that there is no basis at this time for finding that Mo engaged in governmental misconduct, I decline to comment or rule on the merits of this alternative argument by the City.

6

> lawyers. For me, if it smells it could be sulfur, a rotten egg, burned rubber. Obviously, by and large, the smell test proves to be accurate in most cases. What I'm basically saying is, give me all the evidence. The department gave up. They threw in the towel. They gave me nothing. Now the question becomes why.

Guy Lawson and William Oldham, The Brotherhoods 285, id. Ex. R.

At deposition, Mo himself described his discussion with The Brotherhoods author William Oldham as: "[W]e were talking basically trying to find out how the proceeding went and how the decision was arrived at. It was almost like, you know, doing an analysis of that decision I wrote." Mo Dep. at 123:17–21. Mo admits to having been similarly loquacious with Mob Cops author Greg Smith, see id. at 72:8–16, Mafia Cops author Bob Drury, id. at 282:14–283:22, the Daily News, id. at 159:4–12; and plaintiffs' counsel, id. at 131:7–132:13.

Courts frequently deem otherwise valid privileges waived when information is disclosed to third parties. See, e.g., Hobley v. Chicago Police Commander Burge, 445 F. Supp. 2d 990, 999 (N.D. Ill. 2006) (finding governor waived any privilege to protect his thought processes pertaining to pardons of police officers when he publicly discussed them with a talk show host); Clark v. Falls, 124 F.R.D. 91, 94 (E.D. Pa. 1988) (finding executive privilege waived due to disclosure of information to a newspaper and district justice). Plaintiffs acknowledge, however, that no court has explicitly addressed waiver of the mental process privilege via public disclosure by quasi-judicial officers in administrative hearings. Pls.' Mot. at 11. Nonetheless, plaintiffs note that "courts generally allow similar exceptions to the mental process privilege as to the deliberative process and executive privileges," and invite this Court to do the same. Id. (citing N. Pacifica, LLC 274 F. Supp. 2d at 1123; Thomas v. Cate, 715 F. Supp. 2d 1012, 1025 (E.D. Cal. 2010)); see also United States v. Lake Cnty. Bd. of Comm'rs, 233 F.R.D. 523, 527 (N.D. Ind. 2005) ("[W]here the mental processes privilege is available, the analysis is the same as that for the deliberative processes privilege."). Accordingly, plaintiffs argue that the fact that Mo

7

openly discussed his role in Eppolito's hearing with reporters at the time of the hearing and with writers at the time of Eppolito's 2006 criminal trial, and that those discussions are memorialized in publicly available publications, constitutes a waiver of the mental process privilege.

The City counters that the mental process privilege afforded to quasi-judicial officers cannot be waived based on prior statements to the press or private parties. City's Opp. at 6. In the alternative, the City argues, even if the privilege can be waived, Mo was not authorized by the City to make statements to third parties regarding his mental impressions, and the City itself has not waived the privilege. Id. at 7–11.

First, the City argues that, rather than comparing Mo's mental process privilege to the deliberative process or executive privilege, the Court should treat Mo's privilege in the same manner as the privilege afforded to jurors, since Mo's role in Eppolito's hearing was to act as fact finder. Id. at 6. In support, the City invokes United States v. Roth, 332 F. Supp. 2d 565 (S.D.N.Y. 2004), which held, in part, that "a judge's decision making process, particularly when he is cast in the role of trier of fact, is entitled to equal, if not greater, deference and protection [than what is afforded to jurors]." Id. at 567. The Roth court premised its holding on the Second Circuit's decision in United States v. Ianniello, 866 F.2d 540 (2d Cir. 1989), which barred "inquiries into the mental impressions of the jurors" during a hearing to determine whether a previous trial jury relied on improper evidence or instructions. Id. at 544. Similarly, the City argues that no inquiries should be made into Mo's specific mental processes during his role as fact finder in Eppolito's hearing.

Second, the City argues, in the alternative, that even if the mental process privilege can be waived, Mo was not authorized by the City to make statements to third parties regarding his mental impressions, and the City itself has not waived the privilege. City's Opp. at 7–11.

8

In support of the argument that Mo was not authorized to make statements to third parties regarding Eppolito's hearing, the City invokes Dipace v. Goord, 218 F.R.D. 399 (S.D.N.Y. 2003), which notes that "[w]hile disclosure of otherwise privileged material to a non-governmental recipient may result in a waiver, no waiver will be found unless that disclosure was authorized by the governmental agency and voluntary." Id. at 406–07 (internal quotations omitted). The City argues that there is no evidence that any of Mo's statements about the 1985 hearing were authorized by the NYPD, meaning that none of these statements can rightly be considered a waiver of privilege. City's Opp. at 8. The City also argues that Mo's statement to the Daily News on April 21, 1985, is the only statement that could potentially have been authorized by the NYPD because it is the only one of Mo's public statements that was made during his NYPD tenure. Id. Regarding Mo's remarks to the Daily News, the City cites In re Sealed Case, 121 F.3d 729, 741 (D.C. Cir. 1997), for the proposition that "any waiver is limited to the information specifically released, and not to related materials," meaning, it argues, that Mo could only be deposed as to the substance of that public statement, which he already has been. City's Opp. at 7. In sum, the City argues that the mental process privilege is the NYPD's to waive, not Mo's individually.

The City also maintains that the NYPD has never waived the mental process privilege covering Mo's testimony, see id. at 10–11, and that Mo was never authorized by the NYPD to speak publicly about the hearing, id. at 10. The City also argues that Mo's 1985 comments to the Daily News are his only public comments that could possibly be construed as a waiver by the NYPD, about which he already openly testified at his first deposition. Id. at 10.

I agree with plaintiffs that Mo has clearly waived the mental process privilege by repeatedly and extensively disclosing details about his role and thought process during

9

Eppolito's hearing to the general public. "The mental process privilege, like the deliberative process privilege, is qualified - *i.e.*, it may be overcome." N. Pacifica, LLC, 274 F. Supp. 2d at 1122 (citing Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 420 (1971)); Village of Arlington Heights v. Metropolitan Hous. Dev., 429 U.S. 252, 268 (1977)). While I am mindful of the absence of clear precedent as to whether the mental process privilege can, like the deliberative process or executive privileges, be waived via public disclosure by quasi-judicial officers, I agree with the reasoning of courts in other jurisdictions that have recognized similar exceptions and waivers to the mental process privilege as those of the deliberative process and executive privileges. Therefore, I hereby adopt the same reasoning here.

I specifically concur with the reasoning of Magistrate Judge Chen in N. Pacifica, LLC, in which he decided that "[g]iven the related policy concerns that drive the two privileges, the Court concludes that the factors . . . as to whether the deliberative process privilege should be overcome may be used as guidance in determining whether the mental process privilege should be overcome." 274 F. Supp. 2d at 1123. Given that the factors for weighing whether or not the deliberative process privilege can be overcome may also be applied to the mental process privilege, it stands to reason that the same possible waivers of the deliberative process privilege may also be applied to the mental process privilege. See Thomas v. Cate, 715 F. Supp. 2d 1012, 1024 n.9 (E.D. Cal. 2010) ("Most courts that have addressed the mental process privilege and deliberate process privilege conflate the two issues."); id. at 1025 ("Whether the mental process privilege affords broader protection than the deliberative process privilege is unsettled."); see also Nat'l Council of La Raza v. Dep't of Justice, 339 F. Supp. 2d 572, 585 (S.D.N.Y. 2004) (finding that an agency waived the deliberative process privilege by publishing the contents of an otherwise privileged document).

Mo's voluntary and repeated divulgence of his mental processes to the media closely resembles the conduct of former Illinois Governor George Ryan, whose privilege was deemed waived in light of his having "appeared on a nationally-televised talk show . . . specifically for the purpose of responding to questions by the host of the show regarding his decision to pardon" inmates on death row. Hobley, 445 F. Supp. 2d at 999. The Hobley court went on to conclude that:

> Having voluntarily agreed to respond publically to questions from a talk show host on the basis for his decision to pardon the Plaintiffs and the evidence he considered in making that decision, Ryan cannot now claim a privilege to refuse to give testimony in a civil case on that same topic.

Id.

Similarly, having freely divulged his thought processes during the Eppolito hearing to multiple public media outlets, and even also to plaintiffs' counsel, Mo no longer has any right to invoke the mental process privilege. See, e.g., "Detective cleared of leaking secrets", Daily News, Apr. 21, 1985, Pls.' Mot. Ex. P (quoting Mo: "There was no evidence before me other than that Detective Eppolito epitomizes the finest in the department and is the unfortunate victim of circumstances,"); Greg B. Smith, Mob Cops 45–46, id. Ex. M (quoting Mo: "In this case, I was not given the opportunity to make additional fact-finding based on demeanor. God knows why the department threw in the towel on this. I never had a chance."); Guy Lawson and William Oldham, The Brotherhoods 285, id. Ex. R (quoting Mo: "What I'm basically saying is, give me all the evidence. The department gave up. They threw in the towel. They gave me nothing. Now the question becomes why."). Mo's repeated and unqualified willingness to discuss Eppolito's hearing with numerous members of the media and others over the course of more than twenty years constitutes an unequivocal waiver of the mental process privilege via public disclosure.

11

I decline the City's invitation to analogize Mo's mental process privilege to the absolute privilege afforded to jurors. Although the Second Circuit admonishes district courts not to "haul jurors in after they have reached a verdict in order to probe for potential instances of bias, misconduct or extraneous influences," Ianniello, 866 F.2d at 543, there can be no fear that inquisition of a fact finder "operate to intimidate, beset and harass," United States v. Dioguardi, 492 F.2d 70, 79 (2d Cir. 1974), where, as here, the prospective inquisition seeks to probe information that the fact finder has already freely divulged to the public. Similarly, while "the overwhelming authority from the federal courts in this country, including the United States Supreme Court, makes it clear that a judge may not be compelled to testify concerning the mental processes used in formulating official judgments or the reasons that motivated him in the performance of his official duties," there can be little question that the issue is moot once the proverbial horse is out of the barn. Roth, 332 F. Supp. 2d at 567 (noting that judges are not obligated to divulge their mental processes, but saying nothing of those who already have of their own volition). Indeed, even if I did analogize Mo's mental process privilege to the absolute privilege afforded to jurors, the City offers no argument or authority suggesting that the juror or judicial privileges cannot be waived; rather, the City only notes that courts are loathe to overrule these privileges. Therefore, I see no other way to view Mo's extensive public comments about his thoughts during the Eppolito hearing than as a voluntary waiver of his mental process privilege and confirmation that his being made to testify about his mental processes at deposition would not "result in a chilling effect which would injure . . . decision-making processes." United States v. Am. Tel. & Tel. Co., 524 F. Supp. 1381, 1385 (D.D.C. 1981).

I also reject the City's argument that plaintiffs must demonstrate that Mo was authorized by the NYPD to share his mental impressions with the press. After all, "[i]t is axiomatic that the

burden is on a party claiming the protection of a privilege to establish those facts that are the essential elements of the privileged relationship." In re Grand Jury Subpoena, 750 F.2d 223, 224 (2d Cir. 1984). The City has provided no evidence that Mo, acting as Deputy Commissioner of Trials, lacked such authority. Indeed, contrary to the City's more equivocal characterization of his testimony, see City's Opp. at 8–9, Mo clearly testified at his prior deposition that he had the authority to make comments to the press about Eppolito's hearing. See Mo Dep. at 61:21–62:25. To the extent that Mo's authorization to make comments during the hearing may have been limited to those that were "more informational in nature without affecting the process," id. at 62:23–25, there certainly can be no danger of tainting the IAD hearing's process more than twenty-five years after its conclusion.[5] There is no evidence that Mo required the authorization of his superiors to make public comments about the hearing over which he presided, or that the mental process privilege was anyone's other than his to waive.

In short, I find that Mo waived the mental process privilege when he freely and openly discussed his decision and mental processes pertaining to Eppolito's hearing with third parties.

*(3)   The City Independently Waived Any Privilege by Failing to Invoke One During the Deposition of Department Advocate Medican*

Lastly, plaintiffs argue that the City independently waived any privilege with regard to Mo's testimony when it failed to invoke the same or similar privilege during the deposition of prosecuting Department Advocate Medican. Pls.' Mot. at 13 (citing McGoldrick, 110 F.R.D. at 157 (noting that the same principles of judicial immunity from suit apply to prosecutors)). As plaintiffs aptly observe, "[t]he City cannot pick and choose which actors' mental processes are privileged and which are not." Id. The City counters this argument by questioning the extent to

---

[5] It is also worth noting that the fact that Mo long ago ceased being affiliated with the NYPD counsels in favor of compelling him to further testify at deposition. Cf. Hobley, 445 F. Supp. 2d at 998 (noting that claim of executive privilege by a former President "is accorded less weight than that of an incumbent President because there is less need to shield a former President from the burden of responding.").

13

which the privilege afforded to those acting in a prosecutorial capacity, like Medican, exactly mirrors that afforded to individuals acting in a quasi-judicial capacity, like Mo. City's Opp. at 10–11.

Because I have already found that Mo waived the mental process privilege on behalf of himself and the NYPD, supra, and because I believe that this is an adequate basis on which to compel Mo to further testify at deposition, I decline to comment or rule on the merits of either party's arguments regarding the City's failure to invoke a privilege during the deposition of Medican. I will, however, note that the inconsistencies between Medican and Mo's testimony about how it came to be that Eppolito's hearing was conducted solely on stipulated facts further underscore "the need for open discovery" in this case. L.H. v. Schwarzenegger, No. Civ. S-06-2042, 2007 U.S. Dist. LEXIS 52060, at *8 (E.D. Cal. July 6, 2007) (discussing the balancing test to be applied when weighing application of the deliberative process privilege).

### III. CONCLUSION

For the foregoing reasons, I hereby GRANT plaintiffs' motion to compel non-party witness Hugh Mo to testify at deposition as to his mental processes regarding the 1985 NYPD IAD hearing of defendant Louis Eppolito. Counsel are directed to coordinate the second deposition of Mo and to inform the Court when a mutually agreed upon date and time has been reached.

SO ORDERED.

Dated: January 9, 2012
Brooklyn, New York

                                                          /s/
                                        JOAN M. AZRACK
                                        UNITED STATES MAGISTRATE JUDGE